# ATTACHMENT B

# NEW TNT MANAGEMENT LLC



HOLLYWOOD, CA 90038
Phone
Fax

March 7, 2011

Chief Judge Gerald E. Rosen
Justice of the United States District Court
Eastern District of Michigan
231 W. Lafayette Blvd., #730
Detroit, MI  48226

Subject: DeShawn Dawson

Dear Honorable Chief Judge Rosen,

On behalf of the New TNT Management LLC, I respectfully request leniency when you consider DeShawn Dawson's sentencing.

Deshawn Dawson is currently being cast in a motion picture along side Calvin Broaddus. Filming is tentatively scheduled for the second quarter of 2011 and funding for the motion picture is highly dependent on his participation. The film's potential distributor is Sony/Lions Gate.

If there are any questions please do not hesitate to contact me.


Thank you,
Via-email
Atron Gregory/President

**EMI MUSIC NORTH AMERICA**

New York, New York 10011

Dated as of: June 14, 2010

DeShawn Dawson p/k/a Mac Shawn
c/o Ben McLane, Esq.
McLane & Wong

North Hollywood, California 91601

Re: **EMI Music North America -w- DeShawn Dawson p/k/a "Mac Shawn"**

Gentlemen:

When fully executed by the parties hereto, the terms set forth below (the "Short Form Agreement"), in conjunction with the terms and conditions set forth in Exhibit 1, attached hereto and incorporated herein by this reference, shall constitute the agreement by and between EMI Music North America ("Company") and DeShawn Dawson p/k/a "Mac Shawn" ("Artist"). All other terms which are not expressly set forth in the Short Form Agreement shall be those terms contained in Exhibit 1 (the Short Form Agreement and Exhibit 1 attached hereto shall collectively be referred to herein as the "Agreement"). Artist is sometimes referred to herein as "you"; any references to "you or Artist" or "you and Artist," and the like, shall refer to Artist alone.

1. Defined Terms: Except as otherwise provided herein, all of the terms used herein shall have the same meanings and definitions as ascribed to such terms in Exhibit 1.

2. Territory: The universe.

3. Term/Services:

    (a) Initial Period plus five (5) Option Periods. Company may exercise its option for each Option Period by notice to you at any time during the then-current Contract Period. Company may exercise its option for each Option Period by notice to you at any time during the then-current Contract Period. The Initial Period shall commence on the date hereof and each Option Period shall commence immediately after the end of the preceding Contract Period. The Initial Period shall continue until the earlier of: the last day of the sixth (6th) full calendar month following satisfactory Delivery of the Initial Period Single (as defined herein) by you to Company; and, ninety (90) days following Company's initial commercial release in the U.S. of the Initial Period Single.

    (b) During the term of this Agreement (the "Term"), Company will have the exclusive right to embody Artist's performances in Master Recordings, and you will cause Artist to render exclusively to Company Artist's services as a performing artist and otherwise in the making of Master Recordings, which services shall include, without limitation, furnishing the services of Artist

ne Recording Commitment (defined below) and furnishing the services of and paying ...rs and other third parties.

Product Commitment:

(a) During the Initial Period you shall cause Artist to record and Deliver to Company, in accordance with the terms and conditions of Exhibit 1, one (1) single entitled "U Do Know That" (the "Initial Period Single"). The parties acknowledge that the Initial Period Single was recorded prior to the date hereof but that such Single shall constitute a "Master" for all purposes under the Agreement.

(b) During each Option Period, if Company exercises one (1) or more of its options therefor, you shall record and Deliver to Company, in accordance with the terms and conditions of Exhibit 1, one (1) Album. You shall Deliver (as defined below) the Committed Album for each Contract Period no later than ninety (90) days after commencement of that Contract Period. During the first Option Period, if any, the First Committed Album to be Delivered may include the Initial Period Single, at Company's sole discretion.

5. Rights: Company will own all Master Recordings, including without limitation the Initial Period Single (excluding the underlying musical composition embodied therein), throughout the universe, in perpetuity, as works-made-for-hire, in accordance with paragraph 5 of Exhibit 1.

6. Advances: All monies paid to Artist or to any Person on Artist's behalf, other than royalties payable pursuant to this Agreement, shall constitute Advances hereunder.

(a) (i) With respect to the Initial Period Single, the Recording Fund shall be an amount equal to Seven Thousand Dollars ($7,000) (the "Single Fund"), which amount shall be payable upon the later of the full execution and delivery of this Agreement or the Delivery of the session files and multi-tracks for Initial Period Single to Company.

(ii) You hereby irrevocably authorize and direct Company to pay an Advance from the Single Fund directly to Doggy Style Records, Inc. c/o Ziffren Brittenham LLP, ███████████, Los Angeles, CA 90067-6406, Attn: David Byrnes, Esq., (Fed I.D. # ███████) ("Doggy Style") in the amount of Six Thousand Dollars ($6,000) in connection with the Initial Period Single. Such Advance shall be payable promptly following the later of full execution and delivery of the Agreement and the Delivery of the session files and multi-tracks for the Initial Period Single to Company. Company's compliance with the foregoing authorization shall constitute an accommodation to you alone; Doggy Style shall not be deemed a beneficiary of it. All payments to Doggy Style under this authorization shall constitute payment to you hereunder, and Company shall have no liability by reason of any erroneous payment or failure to comply with this authorization. You will indemnify and hold harmless Company against any claims asserted against Company and any damages, losses or expenses Company incurs by reason of any such payment or otherwise in connection herewith.

(iii) You hereby irrevocably authorize and direct Company to pay an Advance from the Single Fund directly to Ben McLane, Esq. c/o McLane & Wong LLP, ███████████, ███ North Hollywood, California 91601 (Fed I.D. ███████) ("McLane") in the amount of One Thousand Dollars ($1,000) toward legal fees incurred by you in connection with this Agreement and Initial Period Single, which include attorney fees incurred for producer deals for the Initial Period

Mac Shawn - Short Form Artist Agt (FINAL)

2

Single. Such Advance shall be payable promptly following the later of full execution and delivery of the Agreement and the Delivery of the session files and multi-tracks for the Initial Period Single to Company. Company's compliance with the foregoing authorization shall constitute an accommodation to you alone; McLane shall not be deemed a beneficiary of it. All payments to McLane under this authorization shall constitute payment to you hereunder, and Company shall have no liability by reason of any erroneous payment or failure to comply with this authorization. You will indemnify and hold harmless Company against any claims asserted against Company and any damages, losses or expenses Company incurs by reason of any such payment or otherwise in connection herewith.

(b) With respect to the first Committed Album (if any), the Recording Fund shall be an amount equal to Fifty Thousand Dollars ($50,000), inclusive of the Single Fund.

(c) (i) With respect to the second Committed Album, and each subsequent Committed Album, if any, the Recording Fund shall equal the Formula Amount, subject to the following Minimums and Maximums:

| Committed Album | Minimum | Maximum |
| --- | --- | --- |
| Second Committed Album: | $60,000 | $120,000 |
| Third Committed Album: | $70,000 | $140,000 |
| Fourth Committed Album: | $80,000 | $160,000 |
| Fifth Committed Album: | $90,000 | $180,000 |

The "Formula Amount" for a particular Committed Album hereunder shall mean an amount equal to seventy percent (70%) of the lesser of the following amounts: (A) the amount of audio-only Record royalties, after the retention of reserves, earned by you hereunder from top-line Net Sales through Normal Retail Channels in the U.S. ("USNRC Net Sales") of the immediately preceding Committed Album Delivered hereunder (including, for this purpose, "single-track" ETR sales from such Committed Album and sales of such Committed Album at a "developing artist" price point); or (B) the average of the amounts of such royalties, after the retention of reserves, so earned by you hereunder on the two (2) immediately preceding Committed Albums Delivered hereunder. In either case, the amount of Record royalties with respect to any preceding Album shall be computed as of the end of the month in which occurs the date that is twelve (12) months following the initial commercial release in the U.S. of the Album concerned.

(ii) Conditioned upon your full performance of all your obligations hereunder, Company shall pay you, with respect to each Committed Album, an Advance in the amount, if any, by which the Recording Fund exceeds the Recording Costs for that Album less any excess costs and any Advances paid to you under subparagraph 6(c)(iii) below, payable promptly following the satisfactory Delivery of that Album or, if later, promptly following Company's final determination of the Recording Costs for that Album,.

(iii) With respect to the first through fifth Committed Albums, if any, Company would pay to you from the applicable Recording Fund for such Album, an Advance equal to the lesser of (i) fifteen percent (15%) of the minimum Recording Fund for the applicable Album, and (ii) the amount equal to the difference between the Recording Fund and the approved Recording Budget for the applicable Album for which such Advance is being paid, payable 1/2 promptly following

approved commencement of recording of the applicable Album; and the balance (if any) less any excess costs, promptly following satisfactory Delivery of the applicable Album to Company.

(d) Fifty percent (50%) of all sums paid or incurred in connection with the independent marketing and/or independent promotion of Records embodying Masters hereunder, if any, shall constitute Advances hereunder. All sums paid or incurred in connection with independent publicity for Records hereunder shall constitute Advances.

(e) Each Recording Fund set forth above is inclusive of all Recording Costs, all Advances to you, all Artist advances, all individual producer fees or advances, all sideartist fees, all sample clearance costs and any and all other fees and/or advances payable to any Person in connection with the Album concerned.

7. Royalties: Subject to and in accordance with the terms and conditions set forth in Exhibit 1, with respect to the commercial exploitation of Masters (including AV Masters) hereunder, Company will pay you an "all-in" royalty (i.e., inclusive of all royalties payable to producers and all other royalty participants) during the term of copyright in the country concerned, on top-line Net Sales of Records (including AV Records) and on other exploitations of Masters (including AV Masters), computed by multiplying the applicable percentage indicated below by the applicable Royalty Base and otherwise computed, determined, calculated, reduced, adjusted and paid in accordance with the terms and conditions set forth in the Exhibit 1:

(a) U.S. base rate for top-line Net Sales of Records and other types of exploitations (including ETRs in all formats) except for Singles/Long-Play Singles/EPs in non-ETR formats Albums: Fifteen percent (15%) (the "US Base Rate"). The US Base Rate for a particular Committed Album sold in the U.S. will be increased prospectively as follows: by one-half (½) percentage point for top-line USNRC Net Sales of Albums in excess of 375,000 units as reported by SoundScan (including TEAs); and, by an additional one-half (½) percentage point for top-line USNRC Net Sales of Albums in excess of 750,000 units as reported by SoundScan (including TEAs). As used herein, a "TEA" or "track equivalent album" shall mean an entire Album sold via Electronic Transmission or ten (10) individual, full-length Masters, either contained on an Album or derived from Masters contained on an Album (e.g., specialty remixes of such Masters) hereunder, sold via Electronic Transmission.

(b) U.S. base rate for top-line Net Sales of Singles/Long-Play Singles/EPs (excluding ETRs in all formats): eleven percent (11%).

(c) The base rate for top-line Net Sales of Records and other types of exploitations outside the U.S.: eighty percent (80%) of the US Base Rate (without escalations) for Canada; seventy-five percent (75%) of the US Base Rate (without escalations) for the United Kingdom; seventy percent (70%) of the US Base Rate (without escalations) for the rest of E.U., Japan, Australia and New Zealand; sixty percent (60%) of the US Base Rate (without escalations) for the rest of the Territory.

(d) The Base Rates above are applied to one hundred percent (100%) of the published sub-distributor price applicable to the price series of the unit concerned, in the country of sale, and less all taxes and discounts; Net Sales shall mean one hundred percent (100%) of the aggregate number of Records sold to wholesale and retail customers for which Company has been paid or finally credited, less returns, rebates and credits, and reserves against anticipated returns, rebates and

credits. The royalty rate on any New Media Record (other than ETRs) will be eighty percent (80%) of the otherwise applicable rate.

8. Mechanical Royalties:

(a) You hereby grant to Company and Company's designees an irrevocable non-exclusive license, under copyright, to reproduce each Musical Composition or other Selection written, owned or controlled, directly or indirectly, in whole or in part by you or by a Person affiliated with you or engaged by you, including any producers ("Controlled Composition(s)") on Masters and Records, and to distribute and publicly perform Master and Records throughout the Territory. In the U.S. and Canada, where applicable, mechanical royalties for Controlled Compositions shall be payable on Net Sales of Records hereunder at the following rate in respect of "top-line" sales of Records: seventy five percent (75%) of the minimum statutory rate under Section 115 of the U.S. Copyright Act (or, with respect to sales in Canada, the minimum rate set by the applicable agreement between the CMRRA and the major Canadian record companies) applicable at the time of Delivery or scheduled Delivery, whichever is earlier, of the Master embodying the composition concerned, without regard to playing time (the "Mechanical Rate").

(b) Mechanical royalties payable on all Selections, including Controlled Compositions, embodied on a Record for sale in the U.S. or Canada, shall be subject to the following configurational ceilings, regardless of the number of Selections embodied on such Record (the "Mechanical Ceiling"): Eleven (11) times the Mechanical Rate on Albums; five (5) times the Mechanical Rate on EPs; three (3) times the Mechanical Rate on Long-Play Singles; and two (2) times the Mechanical Rate on Singles. If the aggregate mechanical royalty rate applicable to all of the Selections embodied on any Record hereunder exceeds the applicable Mechanical Ceiling, then (i) the aggregate mechanical royalty rate for the Controlled Compositions, if any, contained thereon shall be reduced by an amount equal to such excess and (ii) if the aggregate mechanical royalty rate applicable to all of the Selections embodied on that Record shall, even as reduced in accordance with clause (i) hereof, still exceeds the applicable Mechanical Ceiling for that Record, then such excess shall be subject to paragraph 9.02. of Exhibit 1. Mechanical royalties shall be subject to, and payable in accordance with, the terms and conditions set forth in Exhibit 1. For the purposes of this paragraph 9 only, "Net Sales" shall mean ninety two and one-half percent (92.5%) of the aggregate number of Records sold to wholesale and retail customers for which Company has been paid or finally credited, less returns, rebates and credits, and reserves against anticipated returns, rebates and credits.

9. Audiovisual Recordings: Subject to the terms and conditions set forth in Exhibit 1, upon Company's request, you shall cause Artist to appear for the making of AV Masters, including, without limitation, so-called "short-form promotional videos" ("Promo Videos"). Company shall pay the AV Production Costs in an amount not to exceed a written budget approved by Company in writing. All AV Production Costs shall constitute Advances hereunder; provided, however, that only fifty percent (50%) of the AV Production Costs for each Promo Video not in excess of Fifty Thousand Dollars ($50,000) may be recouped from your Audio-only Royalties (as defined below) and one hundred percent (100%) of such AV Production Costs for such Promo Video in excess of Fifty Thousand Dollars ($50,000) may be recouped from your Audio-only Royalties. One hundred percent (100%) of the aggregate amount of all AV Production Costs shall be recoupable from AV Royalties. As used herein, the term "AV Royalties" means all record royalties payable to you hereunder in connection with the sale of AV Records and the exploitation of AV Masters, and the term "Audio-only Royalties" means all record royalties payable to you hereunder other than AV

Royalties. Provided you are in compliance with all of your material obligations hereunder, Company shall produce one (1) Promo Video derived from a Master embodied on each Committed Album. Notwithstanding the foregoing, Company will not be required to produce a Promo Video for any Album if Company is not then producing Promo Videos at such time to promote the sale of Records by a majority of artists performing in Artist's genre and/or by a majority artists of a stature equal to that of Artist's stature at that time.

10. <u>Independent Marketing; Promotion; Publicity</u>: Fifty percent (50%) of all monies spent by Capitol for independent promotion, and one hundred percent (100%) of all monies spent by Capitol for and independent marketing and independent publicity shall be recoupable from record royalties.

11. <u>Tour Support</u>: Subject to the terms and conditions set forth in Exhibit 1, upon your request, Company shall consider providing Artist with an Advance for concert tour deficit financing. Company shall have the right to approve such elements as other artists, schedule, and budget and Company may withhold its approval in its sole, unrestricted discretion and shall have no obligation to advance any such funds.

12. <u>Commercial Merchandising Rights:</u> Company shall have the right to sell merchandise items bearing two (2) exclusive designs per Album cycle, mutually approved by Artist and Capitol, which embody Artwork or artwork-related materials created under this agreement or otherwise funded by Company. Company shall pay you 50% of Net Income from merchandise sales, notwithstanding the recoupment status of Artist's royalty account with Capitol.

13. <u>Non-Record Income:</u> In consideration of the rights granted herein, subject to and in accordance with the terms and conditions set forth in Exhibit 1, Artist hereby grants an income interest to Company with respect to their ancillary activities, as follows:

 (i) Basic Formula: Company shall be entitled to receive an amount equal to 10% ("Company's Ancillary Income Share") of all monies payable by third parties in connection with the exploitation of Artist's name, likeness, personal services in the entertainment or media businesses, including live and dramatic performances, songwriting and endorsements ("Ancillary Income"), less the exclusions described in this paragraph below (Ancillary Income less such exclusions being referred to as "Adjusted Ancillary Income"). In determining Adjusted Ancillary Income, the following shall be excluded from Ancillary Income:

 (A) revenues earned by Artist as producers and/or mixers; and
 (B) in connection with Artist's live performances: (1) the actual costs of "sound and lights" charged to Artist, (2) actual, documented agency fee paid by Artist to a bona-fide, third-party booking agent, not to exceed ten percent (10%) of Gross Ancillary Income otherwise payable to Artist; and, (3) tour advances (if any) paid by Company.

 (ii) End Date: Company's Ancillary Income Share will cease after the end of the "album cycle" (including relating touring activities) for the last Album delivered under the recording agreement.

14. <u>Other Terms</u>:

Mac Shawn - Short Form Artist Agt (FINAL)　　　　　6

(a)  You and Company hereby acknowledge and agree that it is the parties' mutual intent to enter into a more formal agreement (the "Long Form Agreement") at a later date. The terms and provisions of the Long Form Agreement shall include the terms and provisions set forth in Exhibit 1, as modified and supplemented by the terms set forth above. Notwithstanding the foregoing, you and Company hereby agree to negotiate in good faith the terms of Exhibit 1 not specifically set forth in this Agreement prior to the execution of the Long Form Agreement, provided that Company shall have no obligation to deviate from the terms set forth in Exhibit 1, as modified and supplemented by the terms set forth above, to the extent such terms are customary for new artists of Artist's stature, and provided further that the terms of this Agreement, including, without limitation, the terms and conditions set forth in Exhibit 1, as modified and supplemented by the terms set forth above, shall remain in full force and effect and shall be fully binding upon the parties hereto until such time as the Long Form Agreement has been fully executed and delivered.

(b)  Each party hereto has participated equally in the preparation and negotiation of this Agreement, including all exhibits, attachments, annexes, appendices, exhibits, and schedules hereto, and each party hereto hereby unconditionally and irrevocably waives to the fullest extent permitted by law any rule of interpretation or construction requiring that this Agreement, including Exhibit 1, and any exhibit, attachment, annex, appendix, exhibit, and schedule hereto, be interpreted or construed against the drafting party.

(c)  This Agreement sets forth your and Company's entire understanding relating to its subject matter and all prior and contemporaneous understandings relating to the same have been merged herein. This Agreement shall not become effective until signed by you and countersigned by a duly authorized officer of Company. Notwithstanding the foregoing, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Very truly yours,

EMI MUSIC NORTH AMERICA

By_____
   An Authorized Signatory

**PHILIP WILD**
**Senior Vice-President**
**Business Affairs**

ACCEPTED AND AGREED TO:

_____
DeShawn Dawson p/k/a Mac Shawn

Date of Birth: ███████

Social Security #: ███████

Mac Shawn - Short Form Artist Agt (FINAL)        7